UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA BECHELLI-GONZALEZ, | Case No. 16-cv-07284-MEJ |
| Plaintiff, | |
| | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | Re: Dkt. Nos. 21, 26 |
| Defendant. | |

## INTRODUCTION

Plaintiff Teresa Bechelli-Gonzalez alleges she became disabled due to back pain that was caused by an injury she suffered in a car accident. She brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Commissioner of the Social Security Administration, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 21[1], 26. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record (AR), and the relevant legal authority, the Court hereby **GRANTS IN PART** Plaintiff's motion and **DENIES** Defendant's cross-motion for the reasons set forth below.

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On May 7, 2013, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on February 22, 2012. AR 23, 130. The Social Security Administration (SSA) denied Plaintiff's claim, finding that Plaintiff did not qualify for disability benefits. AR 83-

---

[1] The Court construed Plaintiff's Declaration dated November 27, 2017 (Dkt. No.21) as a Motion for Summary Judgment (Order, Dkt. No. 25).

87.  Plaintiff subsequently filed a request for reconsideration, which the SSA also denied.  AR 89-

93.  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was

conducted before ALJ John Hayer on April 27, 2015.  AR 38-56.  Plaintiff testified in person at

the hearing and was represented by counsel, Kevin LaPorte.  The ALJ also heard testimony from

Vocational Expert (VE) Harlan Stock.

## A.    Plaintiff's Testimony

Plaintiff worked as an office manager, legal secretary, and paralegal for approximately

thirty years, until she was laid off from her firm in 2011.  AR 41-42 (testifying she was laid off in

April 2010); *but see* Reply at 5, Dkt. No. 27 (Plaintiff was laid off in 2011, not 2010); AR 134

(earning report showing Plaintiff earned $70,500 in 2010, and $23,600 in 2011 from the same law

firm); AR 346 (August 14, 2012 doctor's consultation notes indicating "Patient has been off work

for a year.  She is a paralegal for Cartwright Law Firm").  Plaintiff looked for another job from

that point until February 2012, when she was involved in a serious auto accident wherein she

suffered an L1 compression fracture.  AR 42.  She stopped looking for work thereafter because she

suffers from chronic back pain.  *Id.*

While Plaintiff has always had degenerative back disease, she had never broken her back

before the car accident.  AR 42-43.  She was always able to work before her accident, despite pain.

AR 43.

Plaintiff can lift ten pounds, stand for 10-20 minutes, walk for up to 20-30 minutes, and

can sit for 20 minutes before having to change positions.  AR 43.  These limitations change

depending on the type of work she is performing; for example, if she is doing any type of

computer work, she will develop sharp, stabbing pain, and can only perform that type of work for

10 minutes.  *Id.*; *see also* AR 49-50 (extensive problems keyboarding and radiating pain when

doing so; pain is grueling).  She has tendonitis in her hand; while she used to type 110 words per

minute but she cannot do so anymore.  AR 50.

On a typical day, Plaintiff wakes up at 7:00 or 8:00 a.m.; takes her medication, which takes

up to an hour to become effective; takes a shower, which takes about an hour; vacuums and dusts

for approximately an hour; goes to the grocery store to buy fresh fruits and vegetables every day; "cook[s] three practically fresh meals a day" since her husband had heart surgery in July [2015]; goes for a 20-30 minute walk with her husband and her dog; eats dinner, then usually goes to bed around 8:30 p.m.  AR 44, 46.  They may watch television at night, but she does not do so during the day.  AR 45.  Her son lives downstairs and carries up her laundry and groceries.  AR 48.  She has a housecleaner who comes once a month.  AR 45.

Her compression fracture hurts the most between 2:00 and 4:00 p.m.; she takes many breaks during that time.  AR 44.

At the time of the hearing, Plaintiff was taking a number of medications: morphine for pain, MS-Contin, Norco, Flexeril, an anti-inflammatory, Flector patches and cream, heart medication, and thyroid medication.  AR 46-47.  She takes valium for muscle spasms and anxiety.  AR 47.  These medications work in the morning, but by afternoon, she has to use ice packs and has stretch her back to relieve the pressure of her compression fracture; after a certain point in the afternoon, lying down is the only thing that helps.  *Id.*; *see also* AR 51 (her best period of the day is until approximately 1:00, then she changes from "Dr. Jekyll to Mr. Hyde").  Some of her medications sometimes make her drowsy or lose concentration.  AR 47.  She needs to have written instructions because she will not remember conversations.  AR 48, 50.

Plaintiff was focused on her own physical rehabilitation, but she put that on hold when her husband had a heart attack.  AR 44-45.  She used to go to yoga and do her rehab at the gym, but she had done neither in the 8 months preceding the hearing.  AR 45.  Her doctors have recommended injections for the pain, and she may be a candidate for a new procedure.  AR 49-50.

Plaintiff likes to read, and she can use an iPad while sitting on the couch.  AR 45.  She rarely goes to movies, and cannot comfortably sit through a screening.  AR 46.

She stopped drinking in March 2014.  AR 48.

**B.      Vocational Expert's Testimony**

VE Stock testified that an individual who can lift 20 pounds, and can complete an 8-hour workday given an as-needed, sit-stand option, could not perform any of Plaintiff's past work as a

paralegal, legal secretary, or office manager. AR 52-53. He testified such an individual could perform work as a pari-mutuel ticket seller and parking lot attendant, even eroding the national job numbers by 50% to account for the sit/stand at will option. AR 53-54.[2] He also testified such an individual could work as a toll collector, which was a sit/stand position. AR 54.

If the same individual were off-task 20% of the day due to pain, she would not be able to return to Plaintiff's past work or perform any other type of job in the national economy. AR 54-55. If she could only occasionally reach, no more than 20% of the work day, she could neither return to her past work nor perform any other jobs. AR 55. If she could only stand for 4 hours out of an 8-hour day, she could not perform her past work, but she could work as a pari-mutuel ticket seller, parking lot attendant, and toll collector, because those positions have a sit/stand option. AR 55. But if the same person had to take unscheduled breaks every 45 minutes for 5 minutes at a time, she could not perform any work. AR 55. If she had to miss three days of work per month, she also could not perform any work. AR 55-56.

## C.     The ALJ's Findings

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[3] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the

---

[2] The ALJ asked VE Stock for the basis of his expertise to identify jobs that permit a sit/stand option, given that the Dictionary of Occupational Titles (DOT) does not discuss this option. AR 53. VE Stock explained he had been a vocational rehabilitationist for more than 40 years, performed many a job analysis, and discussed with people who have jobs that the DOT has labeled light who have a sit/stand option and can sit or stand at will. AR 53.

[3] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

4

Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since February 22, 2012, the alleged onset date. AR 25.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, and status post L1 compression fracture. AR 25. The ALJ determined that Plaintiff suffers from other conditions, including hypothyroidism, hypertension, asymptomatic cholelithiasis and is status post left shoulder arthroscopy, but that the record does not document any symptoms, complaints, or functional limitations as a result of these other conditions. AR 25. Finally, the ALJ acknowledged Plaintiff's complaints of anxiety, but found no medical records establishing a diagnosis for this condition, and no medical signs or findings to substantiate the existence of a mental medically-determinable impairment. AR 25.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the Listing of Impairments). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 25-26.

1    Before proceeding to step four, the ALJ must determine the claimant's Residual Function

2    Capacity (RFC).  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

3    setting, despite mental or physical limitations caused by impairments or related symptoms.  20

4    C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all of the

5    claimant's medically determinable impairments, including the medically determinable

6    impairments that are nonsevere.  20 C.F.R. § 404.1545(e).  Here, the ALJ determined that Plaintiff

7    has the RFC to perform light work and can complete an eight-hour workday if given the option to

8    alternate between sitting and standing, as needed, in 30-minute increments.  AR 26-30.

9    The fourth step of the evaluation process requires that the ALJ determine whether the

10   claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv);

11   404.1520(f).  Past relevant work is work performed within the past 15 years that was substantial

12   gainful activity, and that lasted long enough for the claimant to learn to do it.  20 C.F.R. §

13   404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the claimant is not

14   disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Here, the ALJ determined that Plaintiff could not

15   perform any past relevant work as a paralegal, legal secretary, or office manager.  AR 30.

16   In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

17   are other jobs existing in significant numbers in the national economy which the claimant can

18   perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

19   404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of

20   a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404,

21   Subpt. P, App. 2.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here, based on

22   the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the

23   ALJ determined Plaintiff could perform work as a pari-mutuel ticket seller, parking lot attendant,

24   and toll collector, each of which exists in significant numbers in the national economy.  AR 31.

25   **D.    ALJ's Decision and Plaintiff's Appeal**

26   On July 21, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not

27   disabled.  AR 23-32.  This decision became final when the Appeals Council declined to review it

28

on October 19, 2016.  AR 1-7.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On November 27, 2017, Plaintiff filed the present Motion for Summary Judgment.  On January 11, 2018, Defendant filed a Cross-Motion for Summary Judgment.  Plaintiff filed a reply on February 8, 2018.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.  *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  A court may not reverse an ALJ's decision on account of an error that is harmless.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## DISCUSSION

Plaintiff argues the ALJ committed a number of reversible errors.  *See* Mot.  The Court

7

addresses Plaintiff's main arguments below: whether the ALJ's credibility finding was supported by substantial evidence; and whether his rejection of a treating physician opinion was based on clear and convincing evidence.

**A.     Credibility Finding**

The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. AR 27. The ALJ's conclusion was based on the following: (1) Plaintiff's daily activities were not so limited as would be expected given her complaints of disabling symptoms; (2) Plaintiff went on vacation to Hawaii in May 2013; (3) Plaintiff provided inconsistent information regarding her alcohol consumption; (4) Plaintiff gave inconsistent information regarding the reason for not undergoing back surgery; (5) her medications have been relatively effective in reducing pain; (6) there are significant gaps in her treatment history, which is not consistent with disabling levels of pain; (7) her treatment has been conservative in nature; and (8) Plaintiff stopped working not because of pain, but because she was laid off from her job. AR 27-28.

Because the ALJ did not make any finding of malingering, his adverse credibility finding must be based on clear and convincing substantial evidence. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). In addition, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834; *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 489, 492-94 (9th Cir. 2015) ("To ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination.").

1.     <u>Daily Activities & Vacation</u>

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work

environment where it might be impossible to rest periodically or take medication." *See Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996).  However, "[w]hile a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1111 (internal quotation marks and citations omitted).

The ALJ found that Plaintiff's daily activities of taking care of her personal hygiene, going to the grocery store, vacuuming and dusting, cooking; "do[ing] yoga and [working] out at the gym until her husband became ill"; were inconsistent with her allegations of disabling pain.  AR 27. First and foremost, the ALJ did not attempt to evaluate or explain how any these activities indicated capacities that were transferable to a work setting:  how far is the grocery store from Plaintiff's house, and does she walk or drive there?  How long does each excursion to the store take?  How long does vacuuming and dusting take, and how much does she do?  How long does cooking take?  Does Plaintiff take rest breaks while she performs these activities, or does she have to stop because her medication makes her drowsy or due to pain?  The record does not support the ALJ's apparent conclusion that Plaintiff performs these tasks in a manner that suggests she could transfer them to a work environment where it might not be possible to rest periodically.  For example, Plaintiff testified that showering took her approximately one hour.  AR 44.  In her exertion questionnaire, Plaintiff states that her back gives out around 3:00 to 4:00 p.m. every day, that housework is always painful, and that she needs to rest after walking 3-4 blocks; she carries light groceries four times per week; she vacuums but rolls and does not lift the appliance; and she can drive a car for 40 minutes before she needs a break.  AR 165-66; *see also* AR 182 (daily chores done in pain).

Furthermore, the ALJ's statement that Plaintiff "does yoga and used to work out at the gym" (AR 27) mischaracterizes Plaintiff's testimony.  Plaintiff testified that until her husband had a heart attack, she was focusing on her physical rehabilitation—this included performing her physical therapy at the gym.  AR 44.  Plaintiff thus was complying with her doctor's

recommended course of treatment—not simply working out at the gym.  On the contrary, Plaintiff

explained in her disability report on appeal that after she finishes her physical therapy regimen,

she is "in intense pain and . . . must ice immediately after physical therapy."  AR 179.  Plaintiff

only testified that she "was going to yoga" in the past (AR 45), and her attorney informed the

Appeals Council that Plaintiff had not, in fact, been able to participate in yoga classes since her

accident (AR 214).  Similarly, the ALJ's statement that in April 2012, Plaintiff "stated her back

pain was at baseline and she acknowledged working out on a regular basis" (AR 28 (citing Exs.

5F, 8F)), completely mischaracterizes the exhibits cited in support of the statement.  On April 3,

2012, Plaintiff consulted with Dr. Sun, a Board Certified Orthopedic Surgeon; Dr. Sun wrote:

"She is active at baseline and works-out on a regular basis."  AR 264 (Ex. 5F/21).  It is clear from

this note that Dr. Sun was describing Plaintiff's baseline and work-out regimen *before* her

February 2012 accident, not her current state, which required her to use a brace with

approximately 50% improvement in her pain; and involved moderate tenderness, pain, and limited

lumbar range of motion.  AR 264-65; *see also* AR 345 (Plaintiff lived a very active lifestyle, was

working out and had no limitations until car accident; since the accident she can no longer remain

at the gym, is unable to ski, and is limited with golfing).

     The ALJ found the fact Plaintiff went on vacation to Hawaii in May 2013 "suggest[ed] that

the alleged symptoms and limitations may have been overstated."  AR 27 (citing 4F).  Exhibit 4F

is a May 2013 treatment note from Paul Hartman, M.D., a dermatologist who examined three skin

lesions that caused Plaintiff concern.  AR 243.  Dr. Hartman notes that "the patient just returned

from Hawaii and she is darkly tanned."  *Id.*  The ALJ does not explain how this trip[4] is

inconsistent with Plaintiff's claimed symptoms: the ALJ did not ascertain whether Plaintiff was

able to sit comfortably during the plane trip, or whether she had to take additional pain medication

---

[4] Nothing in the record supports the ALJ's finding that Plaintiff went to Hawaii on vacation.
Plaintiff explains she went to Hawaii with her siblings to attend her mother's funeral.  Mot. at 2.
The Court appreciates Plaintiff's efforts to correct the record by providing additional information
in her Motion and Reply briefs, but this Court is bound by the evidence in the record; it generally
cannot rely on the additional information Plaintiff now provides.

or walk around the cabin; he did not ask whether Plaintiff spent her trip relaxing her back, or whether she took an intensive hiking tour of an island; nor did he ascertain whether Plaintiff is usually "darkly tanned" because she lives in Coastal California or whether she acquired this tan in Hawaii.

The undersigned finds that these are not clear and convincing reasons supporting an adverse credibility finding.

### 2. Last Date of Alcohol Consumption

The hearing before the ALJ took place on April 27, 2015. AR 40. The ALJ asked Plaintiff when she last drank alcohol; she responded March 2014. AR 48; *see also* AR 395 (Dr. Carillo's April 16, 2014 note indicating Plaintiff had been on a drinking binge since March 17, 2014).[5] The ALJ found this testimony untruthful because records showed she had been taken to the hospital twice in April 2014 for acute intoxication. AR 27. Plaintiff misstating the date of her last drink by one month, one year after the event does not constitute "clear and convincing evidence" supporting an adverse credibility finding, especially when the ALJ chose not to ask Plaintiff about the discrepancy during the hearing. Defendant cites without analyzing *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999), for the proposition that "[u]ntruthfulness[] about substance abuse has been held a clear and convincing reason[] to reject a claimant's testimony." Opp'n at 3. The

---

[5] Defendant writes, without citation to Plaintiff's Motion, that she "argues she is an alcoholic and should not be held accountable for this misrepresentation." Opp'n at 3 n.1. Plaintiff argues no such point. *See* Mot. Plaintiff explains that she understood the ALJ's question to relate to the date of her last "bender", which began in March 2014 when her husband suffered a heart attack and ended in April 2014 with her hospital admissions. Mot. at 5. Plaintiff attaches to her Reply a pre-hearing brief that does not appear in the AR, although the AR contains a cover letter from Plaintiff referring to the pre-hearing brief and asking the SSA to return a stamped copy of the brief. AR 395 (cover letter); Reply, Ex. 1 (Brief). In the pre-hearing brief, which is dated November 30, 2014, Plaintiff explains she is a recovering alcoholic who chose to drink in April 2014 after being in recovery for more than 25 years. Brief at 2. There is no indication the ALJ received the Brief, and Plaintiff's attorney did not attempt to submit it into evidence during the hearing. AR 40. Defendant also argues Plaintiff's untruthfulness about her alcohol consumption is supported by Dr. Derby's August 14, 2012 notes, in which states "The patient drinks less than one alcoholic beverage per week. The patient has never been told she is alcohol or chemically dependent." Opp'n at 3 n.1. First and foremost, the ALJ did not rely on this statement as a reason for discrediting Plaintiff. Second, while Defendant correctly quotes the note, Plaintiff's history of drinking (including her March 2014 binge) was known by her treating physicians. *See* AR 395 (Dr. Carillo); AR 397 (Dr. Fernandez).

claimant in *Verduzco* argued the ALJ improperly disregarded his testimony of excess pain and fatigue; the Ninth Circuit found that the fact that the claimant's testimony and various statements regarding his drinking were not consistent was one of several clear and convincing reasons for finding the claimant not entirely credible. 188 F.3d at 1090. But the Ninth Circuit opinion does not describe the claimant's testimony, nor the nature of the inconsistencies. In a report and recommendation to deny Mr. Veracruz's claim for benefits, a magistrate judge observed that the ALJ had noted "specific inconsistencies in plaintiff's statements. Plaintiff testified at the time of his hearing that he drinks an average of 24 bottles of beer a day and has been doing so for the past two or three years. However, this conflicts with the prior statements by plaintiff stating that he does not abuse alcohol or that his alcoholism was in remission." *Verduzco v. Callahan*, Case No. 96-6642 (C.D. Cal.), R&R at 6 (filed Sept. 25, 1997), Order Adopting R&R (filed Oct. 23, 1997). Compared to the dramatic inconsistencies at issue in *Verduzco*, Plaintiff misstating the date of her last drink by one month is not a clear and convincing reason to find her not credible.

>    3.    Effectiveness of Medication

The ALJ found the medical records revealed medication has been relatively effective in reducing Plaintiff's pain. AR 27 (citing Exs. 12F, 13F, 22F). The ALJ does not more specifically identify which records in these exhibits, which total 72 pages, support his conclusion. *See id.* The undersigned nonetheless has reviewed the exhibits cited and finds the ALJ's conclusion is not based on substantial evidence.

Exhibit 12F contains records provided by Plaintiff's treating physician, Loralyn Carillo. Dr. Carillo's notes (AR 391-95) are largely illegible and the undersigned cannot discern any notation suggesting medication has been relatively effective in reducing Plaintiff's pain. Dr. Fernandez's initial evaluation of Plaintiff is included in this exhibit; he relates that Plaintiff's lumbar epidural did not provide Plaintiff with significant relief, nor did Lidoderm. AR 396. Naprosyn only provided Plaintiff with limited relief. *Id.* He opined Plaintiff would need physical therapy, and may need a right sacroiliac joint injection as well as sympathetic blocks to the right L1 level, and consideration for facet joint blocks to two right regions. AR 399.

Exhibit 13F contains records provided by Seton Medical Center regarding Plaintiff's admissions for acute intoxication on two days in April 2014. AR 409-432. None of these records address Plaintiff's pain medication nor its efficacy in managing her pain. *Id.*

Exhibit 22F is a collection of records, including diagnostic imaging reports, lab reports, notes from Drs. Fernandez and Carillo; while the medical notes are largely illegible, the undersigned could discern no statement suggesting Plaintiff's medications were managing her pain.

As none of the exhibits appear to support the ALJ's conclusion that Plaintiff's pain medication was successful in reducing her pain. On the contrary, the record shows a lumbar epidural, Lidoderm, and Naprosyn did not relieve Plaintiff's pain. The undersigned therefore finds that conclusion was not supported by substantial evidence.

4.    Plaintiff's Treatment

The ALJ asserts the record reflects significant gaps in Plaintiff's history of treatment, which is not consistent with disabling levels of pain. AR 27 (citing Exs. 12F, 13F, and 22F). The ALJ does not identify the dates of these "significant gaps" and the exhibits the ALJ cites constitute only a portion of the record. The undersigned has reviewed *monthly* treatment records from Dr. Michael Chiarottino between January 2011 and August 2013, and November 2013 through January 2014; sporadic treatment records from Dr. Carillo from 2010 through July 2014; monthly treatment records from Dr. Fernandez from August 2014 through July 2015; multiple treatment records from Dr. Sun from April 2012 through May 2012; and multiple treatment records from Dr. Derby from August 2012 through September 2012. *See* Exs. 5F & 12F (Dr. Carillo); Exs. 6F, 10F & 14F (Dr. Chiarottino); Exs. 22F & 24F (Dr. Fernandez); Ex. 8F (Dr. Sun & Dr. Derby). The ALJ's general finding that the record reflects significant gaps in Plaintiff's history of treatment is not based on substantial evidence. Moreover, the ALJ did not attempt to ascertain whether these gaps in fact existed, or whether additional records could be obtained and added to the AR.

The ALJ's adverse credibility finding was based in part on his conclusion that Plaintiff's treatment had been essentially conservative in nature. AR 27 (citing Exs. 3F-8F, 10F, 12F-15F,

United States District Court
Northern District of California

17F-19F, 21F-22F). The ALJ once again does not specifically identify the evidence in this 350-page range of records that supports his conclusion; the more aggressive treatment that would have been appropriate to treat Plaintiff; nor the basis for such an opinion. Dr. Chiarappino, whom Plaintiff saw monthly for pain management, referred her to Dr. A. Shabi Khan to attempt to discover the source of her pain; Dr. Khan referred her to Dr. Yung Chen, who referred her to Dr. Edward Sun, who referred her to Dr. Richard Derby. AR 233. On April 3, 2012, Plaintiff visited Dr. Sun. AR 338-39. He reviewed clinical and radiographic findings with her and reassured her that the L1 compression fracture appeared stable and clinically healing. AR 339. While her pain was also improving, Dr. Sun was concerned about "the significant thoracolumbar kyphosis, which is due to a combination of pre-existing degenerative changes from L1 to L4, as well as significant wedge deformity of the recent L1 compression fracture. The normal thoracolumbar alignment should be neutral and the patient has 35 degrees kyphosis. . . . Given the significant local kyphosis, I suspect the patient will be best served with kyphoplasty in order to restore the collapsed L1 vertebral body and restore the neutral thoracolumbar alignment." *Id*. Dr. Sun reviewed this surgery with Plaintiff and explained that patients with her type of kyphosis "tend to have chronic low back pain and [that he was] concerned the pain may severely interfere with her quality of life, particularly in view of the chronic degenerative changes in her upper lumbar spine." *Id*. One month later, on May 8, 2012, Plaintiff returned to Dr. Sun for a routine follow-up. AR 336. Dr. Sun noted "[s]he decided against kyphoplasty" but did not indicate why. AR 336. Dr. Sun indicated he was "concerned [Plaintiff] may be at risk for increasing back pain due to her underlying multilevel lumbar spondylosis/stenosis with residual thoracolumbar kyphosis" but that, "[s]ince the fracture appears well-healed, *I do not feel there is a role for kyphoplasty at this time*." AR 336 (emphasis added). Thus, one month after recommending the surgery, Dr. Sun decided there was no longer a need for it but was nevertheless concerned about Plaintiff's risk for increasing back pain due to underlying back problems. Dr. Sun recommended Plaintiff to continue with physical therapy and gradually wean herself off pain medication as her symptoms permit; he also thought a trial of selective lumbar epidural injections would be reasonable. *Id.*

14

1    When Plaintiff initially visited Dr. Derby in August 2012, Dr. Derby noted that Dr. Sun

2    initially recommended kyphoplasty, but declined to perform it because Plaintiff was a smoker.

3    AR 233.  Dr. Derby does not indicate whether he obtained this information from Plaintiff, Dr. Sun,

4    or another source.  *See id.*  Dr. Derby found "very visible kyphosis from T12 to L12, with step-

5    off", opined Plaintiff's pain could be related to spinal stenosis, and recommended transforaminal

6    epidural blocks at three levels.  AR 236.  If the stenosis was the cause of pain, Dr. Derby expected

7    the blocks to provide a significant reduction in symptoms; if the kyphotic deformity was the cause

8    of pain, he did not expect the blocks to be effective.  *Id.*  Plaintiff underwent the epidural blocks in

9    August 2012.  AR 237-39.  For the first week after the block procedure, Plaintiff felt "quite a bit

10   better", but her symptoms returned thereafter.  AR 240.  Dr. Derby planned to evaluate the facet

11   joints prior to additional recommendations and to give Plaintiff medial branch blocks at three

12   levels.  AR 240-41.

13   As noted above, the ALJ did not indicate what type of treatment would be more

14   appropriate to treat Plaintiff's condition, nor the basis for his opinion that a more aggressive

15   treatment would have been appropriate.  It is possible, although unstated, that the ALJ based his

16   conclusion on the fact Plaintiff declined to have the kyphoplasty.  The ALJ found Plaintiff's

17   inconsistent reasons for declining back surgery suspect: she initially indicated her surgeon would

18   not perform the procedure due to her cigarette smoking, then indicated that she had declined the

19   surgery.  AR 27 (citing Exs. 3F, 8F, 12F); *see also* AR 396 (Dr. Fernandez notes Plaintiff deferred

20   the kyphoplasty because "she was fearful she would be at risk for fracture at the T12-L2 level").

21   First, it is not clear whether Plaintiff told Dr. Derby that Dr. Sun declined to perform the

22   procedure because she was a smoker, or whether Dr. Derby obtained that information directly

23   from Dr. Sun, who referred Plaintiff to Dr. Derby.  Second, it is not clear that Plaintiff's fear of

24   further fracture if she underwent the surgery was unfounded.  *Cf. Molina*, 674 F.3d at 1113-14

25   ("[A] claimant's failure to assert a good reason for not seeking treatment, or a finding by the ALJ

26   that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain

27   testimony.").  Third, to the extent the ALJ found this to be a material issue, he did not attempt to

28

15

clarify it at the hearing. Fourth, the undersigned cannot find that this alleged inconsistency constitutes clear and convincing reason to discredit Plaintiff's testimony, given that the surgery was deemed unnecessary after only one month, which did not leave Plaintiff much time to assess her need for this surgical procedure. Finally, the record reflects an effort by multiple treating physicians to understand the cause of Plaintiff's back pain, and their recognition that Plaintiff had significant abnormalities in her back that could cause that pain. Drs. Derby and Sun recommended injections, which Plaintiff received. There is no indication that, with the exception of the kyphoplasty, any of her physicians recommended more aggressive treatment. During the hearing, the ALJ asked Plaintiff about her prognosis, and whether her doctors had talked to her about any further treatment besides injections. AR 49. Plaintiff testified that, besides the injections, she might be eligible for a new surgical procedure. AR 49-50. Thus, although Drs. Derby and Sun both found deformities that could account for Plaintiff's pain, neither suggested any form of treatment to Plaintiff besides injection and, for one month, a kyphoplasty. To the extent the ALJ concluded that more aggressive treatment was available or recommended, that conclusion is not based on substantial evidence.

   5. <u>Reasons for Work Cessation</u>

   Plaintiff had an uninterrupted significant earning history starting in 1978 until 2011. *See e.g.*, AR 132-134 (documenting earning history for 1999-2011); AR 138-39 (documenting wages earned between 1978 and 2011). She worked for different law firms as a paralegal or legal secretary, despite a documented history of back and shoulder pain. AR 41-43, 233, 264, 314, 321-22. Plaintiff stopped working in April 2011 when she was laid off due to a downsizing. She looked for work until her accident in February 2012, after which point she felt she no longer could work because of pain. Plaintiff is only seeking benefits from February 2012 onward (AR 58); she is not claiming disability before her accident. The ALJ did not ask Plaintiff what she did to look for work between the time she was laid off and the time of her accident. There is no evidence in the record that contradicts Plaintiff's testimony that she was actively looking for work for the ten months between the time she was laid off and her accident. To the extent the ALJ invoked this as

16

a reason to discredit Plaintiff, the Court finds the ALJ's reason was not based on substantial evidence.

### 6. Summary

The Court may not engage in second guessing of the ALJ's credibility assessment if it is supported by substantial evidence. *Thomas*, 278 F.3d at 958-59; *see also Magallanes*, 881 F.2d at 750. Based on the analysis above, the undersigned finds the ALJ did not identify clear and convincing reasons, based on substantial evidence, for discrediting Plaintiff's credibility.

## B. Treating Physician

### 1. Applicable Standards

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an opinion of a treating physician should be favored over that of a non-treating physician. *Id.* at 830-31. However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The opinion of an examining physician generally is entitled to greater weight than the opinion of a non-examining physician, *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008), and the "opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician, *Lester*, 81 F.3d at 83; *Buck v. Berryhill*, 869 F.3d 1040, 1049-50 (9th Cir. 2017) (applying *Lester* and finding it was error for ALJ to reject opinion of examining physician based on opinion of non-examining expert, especially when opinion of non-examining expert is contradicted by other source); *see also* 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their

medical opinions.").

In order to reject the "uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than offer [] conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted). An ALJ errs when he or she does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, it is error for an ALJ not to offer a substantive basis before assigning little weight to the medical opinion. *See id.* Generally, the SSA will give greater weight to an opinion that is more consistent with the record as a whole. 20 C.F.R. § 416.927(c)(4).

2.    Dr. Fernandez

Dr. Fernandez, of the Comprehensive Spine Diagnostics Medical Group, began treating Plaintiff in August 2014. AR 396-399 (initial consultation report). Dr. Fernandez is Board Certified in pain management and rehabilitation, sports, and pain medicine. AR 399. Upon initial examination, Dr. Fernandez found moderate tenderness in several areas; flexion, extension, and rotation with pain; diminished tendon reflexes; he noted the spine abnormalities revealed on MRIs and ultrasounds; he assessed her as having L5 radiculitis, lumbar disc injury at L4-5, L5-S1, right L1 fracture, and chronic pain with stress. AR 398. He planned to taper Plaintiff off of Norco, reorder a new lumbar spine MRI, reorder physical therapy, and consider a right sacroiliac joint injection as well as sympathetic blocks to the right L1 level and facet joint blocks. AR 398-99.

In November 2014, Dr. Fernandez submitted an RFC form on Plaintiff's behalf. AR 610-

United States District Court
Northern District of California

15. He indicated he saw Plaintiff every 3-6 weeks, and was "attempting to address lumbar pain while tapering dose of acetaminophen medications." AR 610. He described her pain without medication at 7/10, and with medication at 4/10; pain was worse with bending twisting, carrying, or wet or cold weather. He described the findings of an August 2014 MRI, and diagnosed her with lumbar disc injury, L1 fracture, lumbar facet arthralgia, and another condition that was illegible to the undersigned. He acknowledged her prior threating orthopedists and medications. He found her prognosis was "fair" and that her disability had already lasted more than one year. He opined Plaintiff was limited to standing for 30-45 minutes, with 5-10 minute breaks and was limited to sitting for 30 minutes with 5 minute breaks; he explained these limitations were based on the fact Plaintiff's lower back pain worsened with "prolonged sit/stand, bend, twist, lift, [and] reach." He also expected Plaintiff would need to lie down infrequently during the day "for flares." He limited her to rarely reaching up above shoulders, down to waist level or down towards the floor, but did not limit her when carefully handling objects or handling with her fingers. He also found other postural and environmental limitations were appropriate. With these limitations, he opined Plaintiff could work. AR 614 ("Able to work with estimated restrictions as per page 2 & 3"). He rated Plaintiff's credibility about her pain as "good".

Dr. Fernandez completed a second RFC form in April 2015. AR 644-47. He indicated he saw Plaintiff monthly and reiterated the same diagnoses, but now expected her prognosis to be poor due to her history of smoking, alcohol abuse and high opioid use. He described her symptoms as intermittent low back pain, 4-9/10, especially with prolonged standing and sitting. He described treatment with injections and medications. He stated Plaintiff was not a malingerer, that she would have good and bad days, and that he expected her symptoms to interfere with attention and concentration needed to perform even simple tasks frequently—more than 34% in an 8-hour day. He limited Plaintiff to sitting 20 minutes at a time and standing 30 minutes at a time; in total, he limited her to about 4 hours of sitting in an 8-hour day, and 4 hours of standing or walking. He also recommended she walk ten minutes every ten minutes. He stated she would need a job that permitted shifting positions at will. He expected Plaintiff would need to take

United States District Court
Northern District of California

19

unscheduled 5 minute breaks every 45 minutes.  He still found postural and lifting limitations.  He estimated that Plaintiff would miss on average 4 days of work per month as a result of her impairment or treatment, and would be unable to complete an 8-hour workday on average 3 days a month as a result thereof.  He repeatedly noted the RFC questionnaire did not substitute for formal functional capacity evaluation (FCE) and recommended an FCE.  AR 645-47.

Plaintiff appeared for a follow-up evaluation with Dr. Fernandez on April 23, 2015.  AR 648-49.[6]  Plaintiff explained her pain remained and had not significantly decreased despite using morphine sulfate, Norco, Sulindac and Flexeril.  She stated she was better with flexion, but worse with squatting, holding and lifting objects, leaning forward and reaching to carry.  Her examination was essentially normal, but Dr. Fernandez still noted some limited range of motion; slight pain elicited with flexion and rotation; moderate to severe tenderness in the L1 area with reversed lordosis; moderate pain to palpation at L4-5, L5-S1.  As is relevant here, he assessed Plaintiff with L5 radiculopathy, lumbar disc injury, and chronic pain.  He planned to continue Plaintiff's drug regimen, request updated x-rays to determine whether the new sits of pain at L4-5 are suggestive for the fracture, and suspend injections and blocks until the next evaluation.  He also recommended she continue to use Dr. Ho's lumbar support.

In May 2015, Plaintiff had another evaluation with Dr. Fernandez.  AR 650-51.  She had difficulty obtaining her medications on a regular basis, and her pain was 8/10 in severity when she did not have them; it was 4/10 with medication.  She noted the pain was worse with extension, squatting, and heavy lifting.  She wanted to hold off on any procedures for her treatment until after her husband's cardiac surgery, which was scheduled for July 2015.  On examination, Dr. Fernandez continued to find pain over the sacroiliac joint, L5-S1, L1, and L4-5.  Lateral flexion and extension elicited pain, as did straight-leg raising.  As is relevant here, he assessed L5 radiculopathy, lumbar disc injury at L4-5 and L5-S1, right L1 fracture, chronic pain with stress, and bilateral sacroiliac arthralgia.  He noted her pain was persistent and he planned to continue her

_____

[6] Records from Dr. Fernandez from this date on are found in Exhibit 24/F, which the ALJ did not have at the hearing.  *See* AR 41.  They were provided to the Appeals Council.  AR 5.

pain medication.  Having reviewed a new x-ray, he noted Plaintiff's back injuries were stable and that degenerative disease was noted at T12-L1, L2-3, and L3-4.  He recommended she continue to use lumbar support, discussed prolotherapy to address hypermobility; they agreed they would consider it after Plaintiff's husband's surgery.

In June 2015, Plaintiff told Dr. Fernandez her pain ranged between 4/10 to 7/10, even with medication; she denied excessive sedation due to her medication.  AR 654-55; *but see* AR 47 (testifying medications make her drowsy).  Plaintiff experienced pain with straight-leg raising; moderate pain with extension, flexion, and rotation; moderate tenderness over L5-S1 and L4-5; and pain at the left sciatic notch and lateral hip.  As relevant here, he assessed L5 radiculopathy, lumbar disc injury, right L1 fracture, and bilateral sacroiliac arthralgia.  He advised her to continue using lumbar support.

In July 2015, Dr. Fernandez noted that Plaintiff does not experience excessive sedation with her medication, and is worse with lifting, twisting, and bending.  AR 656-57.  He found moderate pain over an SI joint, with paraspinal spasms.  The right sciatic notch was moderately painful.  She had complete range of motion, but with moderate pain with lateral flexion and rotation on the right.  Straight-leg raise was positive.  Motor strength and sensibility were intact.  As relevant here, he assessed L5 radiculopathy, lumbar disc injury, right L5 fracture, and bilateral sacroiliac arthralgia.  He advised her to continue using lumbar support.  He also recommended a right SI joint block, and may follow that by injections to the bilateral L5-S1 segments.  He planned to continue seeing Plaintiff in one more month, but there are not additional records in the AR.

3.    Analysis

The ALJ gave Dr. Fernandez's opinion "very little weight" because it conflicted with Plaintiff's activities, such as "doing yoga, gardening, cooking, cleaning and going to the grocery store."  AR 30.  The Court already found the ALJ's analysis of Plaintiff's daily activities were insufficient, as the ALJ did not attempt to ascertain how the activities—as performed by Plaintiff—could translate to the work setting.  The Court also found the ALJ mischaracterized the record with respect to Plaintiff's "doing yoga".

The ALJ further based his evaluation of Dr. Fernandez's opinion on the fact "her compression fracture has healed" and "her gait is essentially normal, she has admitted to feeling good on numerous occasions, full motor strength, intact sensation and . . . range of motion of the back and neck is only mildly limited." AR 30. But the ALJ did not acknowledge Dr. Fernandez's opinion that Plaintiff would have flare-ups or good days and bad days, nor his opinion that Plaintiff's pain increased with prolonged standing and sitting. The fact Plaintiff presented with essentially normal gait and symptoms upon arrival to the doctor on "numerous occasions" thus does not contradict Dr. Fernandez's opinions. Dr. Fernandez, a spine and pain specialist, examined Plaintiff monthly starting in August 2014 and through at least July 2015. During the course of each visit, he tested her flexion and rotation, noted pain and tenderness, found deformities, and recommended a course of medication and injections as treatment. On the RFC forms he completed on Plaintiff's behalf, Dr. Fernandez opined that Plaintiff's credibility was good and that she was not a malingerer. Two other treating physicians, Dr. Derby and Dr. Sun, found significant spinal abnormalities and attempted to discover the source of Plaintiff's pain in 2012. Dr. Sun also indicated he was "concerned [Plaintiff] may be at risk for increasing back pain due to her underlying multilevel lumbar spondylosis/stenosis with residual thoracolumbar kyphosis" even after her L1 fracture was healed in 2012. AR 336. Thus, three of Plaintiff's treating physicians examined Plaintiff, found a physical condition that could account for her pain, and set about treating her pain with injections and medication well after her compression fracture had healed. None of these physicians suggested Plaintiff was exaggerating her pain. The ALJ cherry-picked some records that support his conclusion, but did not provide clear and convincing reasons for rejecting the opinions of Dr. Fernandez, which are fully supported by his treatment notes over one year, are not contradicted by the opinions of any other treating or examining physician, and are fully supported by the earlier findings of Drs. Derby and Sun.

The limitations identified by Dr. Fernandez (e.g., needing to take frequent breaks, inability to concentrate for more than 30% of day, missing several days a month due to condition or treatment, and limitations on reaching) would make Plaintiff unemployable according to the VE

testimony.  *See* AR 54-56.  The ALJ's failure to offer clear and convincing reasons for rejecting Dr. Fernandez's testimony was therefore not harmless.

## CONCLUSION

In reviewing a Social Security Commissioner's decision, a court may remand the case "either for additional evidence and findings or to award benefits."  *Smolen*, 80 F.3d at 1292. Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Moreover, "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated."  *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (reversing and remanding for the consideration of new evidence instead of awarding benefits).

The Court concludes this case should be remanded for further administrative proceedings. The ALJ shall reevaluate Plaintiff's credibility and the opinions of Dr. Fernandez; the ALJ also shall take into account the effect of Plaintiff's multiple medications on her ability to work.  The ALJ may wish to develop the record, for instance, by ordering a consultative medical examination of Plaintiff and/or taking additional testimony from Plaintiff.

For these reasons, the Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision.  This case is **REMANDED** for further administrative proceedings in accordance with this Order.

**IT IS SO ORDERED.**

Dated: February 22, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge